UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ANALYTICA BIO-ENERGY CORP., et al.

Defendants.

No. 18-cv-472 (JDB)

---

## MEMORANDUM OPINION

Before the Court is [14] the Securities and Exchange Commission's (the "SEC") motion for default judgment against defendant Analytica Bio-Energy Corp. ("Analytica") and for monetary relief and final judgment against defendant Douglas Murdock. For the reasons described below, the Court will grant the SEC's motion.

## BACKGROUND

For the purpose of resolving this motion, the Court assumes that all allegations in the well-pleaded complaint are true. See Thomson v. Wooster, 114 U.S. 104, 111 (1885) (plaintiff's claims taken as true after entry of default); Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("A defaulting defendant is deemed to admit every well-pleaded allegation in the complaint."). As alleged, Analytica is a Delaware corporation with shares listed on the over-the-counter market. Compl. [ECF No. 1] ¶ 10. Although Analytica was ostensibly managed by defendant Luiz Brasil, he was president in name only. Id. ¶¶ 19, 21. In reality, Brasil had ceded control to Murdock, who acted as a de facto officer of Analytica from at least July 2013 through October 2014. Id. ¶¶ 19, 21–22. Murdock's previous forays into corporate management had not gone well, however, and

he was already permanently enjoined by the Ontario Securities Commission from trading in securities and from acting as an officer or director of any issuer. Id. ¶ 11.

While under Murdock's stewardship, Analytica filed with the SEC between September 2013 and October 2014 eighteen periodic reports that Brasil and Murdock knew contained material false statements and omissions. Id. ¶¶ 24, 31. The filings falsely conveyed that Brasil had an active—indeed the "sole"—management role in the company, and that he had evaluated and disclosed weaknesses in Analytica's financial reporting and disclosure controls. Id. ¶¶ 25–27. Perhaps unsurprisingly, the filings did not disclose Murdock's own status as a de facto officer and manager of Analytica. Id. ¶ 28.

Meanwhile, Murdock used his control of Analytica to engage in a fraudulent scheme in which he sold unregistered Analytica shares in the public market. In July 2013, he fraudulently obtained for his own companies 1.5 million Analytica shares which he falsely claimed his companies were due as payment for work they were contracted to perform. Id. ¶¶ 35–41. Due to this fraud, the unregistered shares were provided without a restrictive legend warning that they could not be resold on the public market. Id. ¶ 41. He also caused Analytica's transfer agent to remove improperly the restrictive legend from an additional 1.15 million Analytica shares he held in his name by falsely claiming he was not affiliated with Analytica. Id. ¶¶ 43–46.

In April 2014, Murdock transferred these and other Analytica shares to an associate, who set up a brokerage account dedicated to holding the shares. Id. ¶¶ 47–48. Between June and August 2014, more than a half million shares were sold to the public at prices ranging from $1.00 to $1.18 per share. Id. ¶¶ 51–53; Decl. of Kevin Guerrero ("Guerrero Decl.") [ECF No. 14-2] ¶ 2(f). At least $340,369.57 of the proceeds were then transferred to Murdock. Compl. ¶¶ 51–52;

Decl. of Nima Besharat [ECF No. 14-3] ¶¶ 5–9.  By March 2018, Analytica's shares were traded at a price of $0.008 per share.  Ex. 6 to Guerrero Decl. at 2.

On February 28, 2018, the SEC brought a complaint against Analytica and Murdock for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.  [ECF No. 1] ¶ 5.  The complaint also alleges Murdock violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a).  Id.  A consent judgment was entered as to Murdock, who waived findings of fact and conclusions of law and agreed that this Court would determine whether "to order disgorgement of ill-gotten gains and/or a civil penalty"; that for the purposes of such determination, the allegations in the complaint would be accepted as true; and that the determination may be made on the basis of affidavits, declarations, and documentary evidence.  Consent of Def. Douglas G. Murdock [ECF No. 2] ¶¶ 4–5; Consent J. [ECF No. 8] at 1, 5.  Analytica failed to appear or respond to the SEC's complaint, and the clerk entered default against it pursuant to Federal Rule of Civil Procedure 55(a).  Clerk's Entry of Default [ECF No. 13].  The SEC now moves for entry of final default judgment against Analytica enjoining it from violating Section 10(b) of the Exchange Act and Rule 10b–5.  See Mem. of P. & A. in Supp. of Pl.'s Mot. for Final J. by Default Against Def. Analytica Bio-Energy Corp. and for Monetary Relief and Final J. Against Def. Douglas G. Murdock ("Pl.'s Mot.") [ECF No. 14] at 13–24.  At the same time, it also moves for entry of final judgment against Murdock ordering him to pay disgorgement of $340,369.57, plus prejudgment interest of $49,009.26, and a civil monetary penalty of $160,000.  Id. at 24–34.  Neither Analytica nor Murdock has opposed the motion.

## ANALYSIS

### A. Default Judgment as to Analytica

Federal Rule of Civil Procedure 55(a) provides for entry of default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." After entry of default by the clerk, the Court may enter a default judgment against the party pursuant to Rule 55(b).[1] Default establishes the liability of the defaulting party, Adkins, 180 F. Supp. 2d at 17, but the Court must independently determine whether the plaintiff is entitled to injunctive relief, see SEC v. E-Smart Techs., Inc., 139 F. Supp. 3d 170, 177 (D.D.C. 2015).

### 1. Liability

The SEC filed a complaint alleging Analytica violated Section 10(b) of the Exchange Act and Rule 10b–5, which prohibits the making of "any untrue statement of a material fact" or omission of material fact "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. Analytica failed to respond to the complaint or otherwise defend against the action after it was served, and therefore default was appropriately entered against it. See Fed. R. Civ. P. 55(a). This default constitutes an admission by Analytica of liability for the well-pleaded allegations in the complaint, see Adkins, 180 F. Supp. 2d at 17, including that Analytica, through Murdock and Brasil, knowingly made material misrepresentations and omissions in SEC filings

---

[1] "[E]ntry of a default judgment is not automatic, and . . . a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). Because personal jurisdiction is invoked based on the Exchange Act, which provides for worldwide service, "the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." SEC v. China Infrastructure Inv. Corp., 189 F. Supp. 3d 118, 129 n.7 (D.D.C. 2016) (citation omitted). Here, the minimum contacts required by the Constitution are satisfied because Analytica has "purposefully directed" its activities at the United States by filing statements with the SEC and the SEC's claims "arise out of or relate to" misstatements made in those filings. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–73 (1985) (citation omitted); see also China Infrastructure Inv. Corp., 189 F. Supp. 3d at 129 n.7.

4

that were connected with its sale of securities, see Compl. ¶¶ 1–2, 5, 21–22, 24–33, 59–63. Accordingly, the Court finds that the well-pleaded allegations establish Analytica's liability.

**2. Injunctive Relief**

Determination of liability does not, however, answer the question whether the SEC is entitled to the injunctive relief it seeks. See E-Smart Techs., Inc., 139 F. Supp. 3d at 177. Section 21(e) of the Exchange Act, 15 U.S.C. § 78u(e), empowers courts "to issue injunctions commanding compliance with the [federal securities] laws and regulations promulgated thereunder." SEC v. Savoy Indus., Inc., 665 F.2d 1310, 1318 n.54 (D.C. Cir. 1981). A permanent injunction may be issued when there is a "reasonable likelihood" a defendant will commit future securities laws violations. SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994). In determining this likelihood, the Court must consider "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." Id. (citation omitted).

The likelihood that Analytica will commit future violations of Section 10(b) of the Exchange Act and Rule 10b–5 is sufficient to warrant injunctive relief. This is not an instance in which the violation was an isolated, minor incident. Analytica's filing of false statements with the SEC was a persistent practice employed in 18 separate reports over the course of more than a year. Throughout, Murdock knew Analytica's statements regarding Brasil's control and management of the company were false and that Murdock himself controlled the company. Such misstatements "were made with the intent to prevent the public from knowing the truth regarding the state of affairs" at Analytica. China Infrastructure Inv. Corp., 189 F. Supp. 3d at 133. These violations are not "merely technical," but instead pertain to the heart of Analytica's corporate structure. Compare id. (finding a pattern of deliberate violations when multiple SEC filings submitted over

5

a six-week period failed to disclose the CFO had resigned and included his forged signature) with SEC v. Steadman, 967 F.2d 636, 648 (D.C. Cir. 1992) (denying permanent injunction where violators "were negligent in failing to add a single footnote about potential liability under the Blue Sky laws").

The Court also finds that there will be "opportunities to violate the law in the future." Bilzerian, 29 F.3d at 695. Although Analytica appears to be defunct, its shares are still being traded and it likely still is obligated to file reports with the SEC. See Guerrero Decl. ¶¶ 6–9 and Ex. 3. Hence, there are still "opportunities . . . to submit false information to the SEC in the future." China Infrastructure Inv. Corp., 189 F. Supp. 3d at.133. And any such misrepresentations could adversely impact investors purchasing the shares that are still in the market. See SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1171 (D.C. Cir. 1978) (noting that a filing occurs "in connection with the purchase or sale of any security" under Section 10(b) "whenever it may reasonably be expected that [the] publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon, regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator"). The Court therefore finds that entry of a permanent injunction prohibiting Analytica from violating Section 10(b) of the Exchange Act and Rule 10b–5 is warranted.

### B. Monetary Relief and Final Judgment as to Murdock

The SEC also moves the Court to order disgorgement of Murdock's ill-gotten gains from the sale of unregistered Analytica shares, as well as a civil penalty for fraudulently obtaining and selling the shares and for filing false reports with the SEC. See Pl.'s Mot. at 24–32. All other issues with respect to Murdock have been resolved through his consent judgment and, for the purposes of this motion, Murdock admits the allegations in the complaint. See Consent J. at 5.

1. **Disgorgement and Prejudgment Interest**

The Court has broad equitable power to order disgorgement of gains from illegal activities. See SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989) (holding courts have authority to order disgorgement despite lack of specific authorization under the Exchange Act). Although disgorgement is considered a penalty for purposes of the statute of limitations contained in 28 U.S.C. § 2462, see Kokesh v. SEC, 137 S. Ct. 1635, 1643 (2017) (holding that § 2462's five-year limitations period for any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture" applies to claims for disgorgement), it is primarily an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment," First City Fin. Corp., 890 F.2d at 1230.[2] Hence, the Court "may exercise its equitable power only over property causally related to the wrongdoing." Id. at 1231. The disgorgement amount "need only be a reasonable approximation of profits causally connected to the violation." SEC v. Whittemore, 659 F.3d 1, 7 (D.C. Cir. 2011) (citation omitted). Once the SEC establishes a defendant's actual profits, the burden shifts to the defendant to demonstrate the disgorgement figure is not a reasonable approximation. First City Fin. Corp., 890 F.2d at 1232.

Here, the total profits realized by Murdock as a result of illegal conduct equal $340,369.57, the sum of the two payments Murdock received from his associate's brokerage account. These payments can be fairly traced to Murdock's fraudulent conduct. Murdock fraudulently obtained and caused the removal of restrictive legends from Analytica shares, which he then transferred to an associate's brokerage account created to hold the shares. Through his associate, Murdock sold

---

[2] The Supreme Court in Kokesh did not address "whether courts possess authority to order disgorgement in SEC enforcement proceedings or . . . whether courts have properly applied disgorgement principles in this context." 137 S.Ct. at 1642 n.3. This Court is therefore bound by the D.C. Circuit's long-standing precedent set forth in First City Financial Corp. concerning the Court's authority to order disgorgement as an equitable remedy.

7

the unregistered Analytica shares in violation of Sections 5(a) and 5(c) of the Exchange Act, 15 U.S.C. §§ 77e(a), (c). Compl. ¶¶ 54-58, 76-78. These sales generated the only cash in the account, which was used to cover the two payments made to Murdock. The $340,369.57 in payments made to Murdock from the account were thus causally connected to his misconduct.

Although these payments are gross proceeds, they may appropriately be considered "a reasonable approximation of profits." See Whittemore, 659 F.3d at 8; E-Smart Techs., Inc., 139 F. Supp. 3d at 184 (concluding the SEC may rely on investor proceeds to approximate profits from the sale of unregistered securities). It is not the SEC's "burden to determine the hypothetical market value of the securities for purposes of offsetting the actual proceeds." Whittemore, 659 F.3d at 7 (citation, quotation marks, and alteration omitted). Murdock has presented no evidence that he provided value for any of the shares he transferred to his associate. Indeed, he concedes he obtained some of the shares through fraud. See Consent J. at 5. Moreover, "the securities were unregistered and could not be sold to the public at all" by Murdock, rendering them of little value. SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1097 (9th Cir. 2010). Hence, the two payments totaling $340,369.57 are a "reasonable approximation of profits causally connected" to his fraudulent acquisition of shares, removal of restrictive legends, and subsequent indirect sale of those shares to the public. Whittemore, 659 F.3d at 7 (citation omitted).

Because the Court finds disgorgement is warranted, it will also order payment of prejudgment interest on the disgorgement amount. Such payment prevents defendants from benefitting from an interest-free loan on ill-gotten gains. SEC v. Levine, 517 F. Supp. 2d 121, 141 (D.D.C. 2007). Murdock has agreed that if disgorgement is ordered, he "shall pay prejudgment interest thereon . . . based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." Consent J. at

8

5. Applying the IRS rate of interest, the amount of prejudgment interest is $49,009.36. Guerrero Decl. ¶ 20.

2. **Civil Monetary Penalties**

The Court may also impose civil penalties pursuant to both the Securities Act and the Exchange Act, which each set forth three tiers of penalties for violations. 15 U.S.C. §§ 77t(d), 78u(d)(3). Third-tier penalties apply when the violation (i) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Id. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The amount of the penalty imposed should be determined "in light of the facts and circumstances" of the particular case, but is capped at the amount identified in the applicable tier. Id. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Under the third tier, penalties must not exceed the greater of $160,000 per violation or "the gross amount of pecuniary gain to such defendant as a result." Id. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).[3]

The SEC requests the imposition of the maximum statutory third-tier penalty of $160,000 for one violation. Pl.'s Mot. at 30. As alleged, Murdock knowingly filed 18 reports which contained false information about Brasil's role in managing the company. This conduct alone constitutes egregious fraud and disregard for regulatory filing requirements, satisfying the first prong of the standard for imposing third-tier penalties. See, e.g., China Infrastructure Inv., 189 F. Supp. 3d at 136–37 (finding defendants' misrepresentation of former CFO's officer status and forgery of his signature in SEC filings satisfied the fraud criterion for penalties analysis). And Murdock engaged in further fraud when he induced the removal of restrictive legends meant to

---

[3] This is the maximum statutory third-tier penalty that can be imposed for violations occurring between March 6, 2013 and November 2, 2015. 17 C.F.R. § 201.1001 tbl.1 (adjusting maximum statutory penalties for inflation).

prevent the sale of unregistered Analytica shares to the public. Hence, the first requirement is easily met.

The Court also finds Murdock's violations satisfy the second criterion for the imposition of third-tier penalties. First, Murdoch knowingly misled investors regarding Brasil's control of Analytica and Murdock's own role managing the company, deceiving investors as to the stability of the company and their investment. Second, his fraudulent scheme put over a half million unregistered shares into the public market. The price then dropped from at least $1 per share in 2014 to less than a penny per share in March 2018. Although the SEC has provided no evidence demonstrating Murdock's actions caused this entire price drop, his violations nonetheless "created a significant risk" that the shares' value would decrease if it later came to light that he was in fact in control of the company or that the shares sold in the public market were unregistered. This risk of substantial losses is sufficient to warrant the imposition of third-tier penalties. See, e.g., SEC v. Enters. Solutions, Inc., 142 F. Supp. 2d 561, 579 (S.D.N.Y. 2001) (finding third-tier penalties to be appropriate where defendant with a history of criminal and regulatory violations failed to disclose his significant participation in the company); cf. Levine, 517 F. Supp. 2d at 141 (imposing third-tier penalties against defendant who filed 29 reports containing false statements and sold artificially inflated stock).

"The purpose of a civil penalty is to punish the individual violator and deter future violations." SEC v. Milan Grp., Inc., 124 F. Supp. 3d 21, 24–25 (D.D.C. 2015) (citation omitted). Murdock thus far has not been deterred. His conduct demonstrates a high degree of scienter and unwillingness to abide by securities regulations. See id. at 25 (noting the court may consider "the degree of scienter" and "whether the conduct was isolated or recurrent" in determining the amount of the penalty). Given that these violations are part of a larger pattern of misconduct and that prior

10

sanctions imposed by a regulator did not dissuade Murdock from further misconduct, the court finds the imposition of the maximum statutory penalty of $160,000 to be appropriate.

**3. Distribution Plan**

The SEC has also requested leave to propose a plan to distribute disgorged funds and penalty payments obtained from Murdock to investors who suffered losses due to his misconduct. The Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002 permit the SEC to move the Court to create such a fund upon the imposition of civil penalties. 15 U.S.C. § 7246(a). The Court shall therefore permit the SEC to make such a motion in the future proposing a plan that provides for "a fair and reasonable allocation of recovered funds to investors." E-Smart Techs., 139 F. Supp. 3d at 192–93.

## CONCLUSION

For the foregoing reasons, the Court will grant SEC's motion for final judgment by default against Analytica and monetary relief and final judgment against Murdock. Separate orders will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 13, 2018